# APPENDIX D

CV07-01281
*Rowe v. Bankers Life*

Appendices D-F to Plaintiffs' Separate and
Controverting Statement of Facts in Support of
Plaintiffs' Response to Defendant's Motion for
Summary Judgment

## AFFIDAVIT OF LINDA ARNOLD

STATE OF ARIZONA     )
                       ss.
County of Maricopa   )

My name is Linda Arnold, and this Affidavit is made on personal knowledge, and I am competent to testify to the matters set forth below.

(1)    I live at 2770 N. Val Vista Road, Apache Junction, Arizona, 85219 and am a neighbor of Fred and Gloria Rowe. We live in a rural desert area east of Apache Junction. The homes in the area come in all different sizes and shapes. Fred and Gloria's home is one of the smaller homes.

(2)    I assisted Fred in making the claim for Gloria's long-term care insurance after she needed care for her Alzheimer's disease. For over a year, I helped take care of Gloria on Sundays and handled the paperwork relating to the claim with Bankers Life. I was also involved in about ten phone calls with Bankers Life in trying to get the claim paid or trying to get information about what was happening on the claim. I don't see how the elderly who don't have help on a claim can survive it. Just from my limited involvement, I found it frustrating and I think a lot of the elderly would just give up. I know that Fred Rowe was frequently frustrated, exasperated, and angry in his efforts to find out what was happening on the claim and when he was getting mixed messages from Bankers Life.

(3)     Gloria fell and broke her leg in the summer of 2007 and had to have surgery. After that, her Alzheimer's became much worse, and Fred became severely depressed. When he is under a lot of stress, he becomes confused and forgetful.


_Linda Arnold_
Linda Arnold

Subscribed and sworn to before me this _1'th_ day of May, 2008.

By _Rickie M Theny_
       Notary Public

My commission expires: _Nov 18, 2010_



OFFICIAL SEAL
RICKIE McTHENY
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires Nov. 18, 2010

# APPENDIX E

CV07-01281
*Rowe v. Bankers Life*

Appendices D-F to Plaintiffs' Separate and
Controverting Statement of Facts in Support of
Plaintiffs' Response to Defendant's Motion for
Summary Judgment

# AFFIDAVIT OF ROBERT W. RAGLE

STATE OF KENTUCKY )

                   ss.

County of _Russell_ )

My name is Robert W. Ragle. This Affidavit is made on personal knowledge, and I am competent to testify to the matters set forth below.

    (1)    I was employed by Bankers Life & Casualty Company from October 15, 1999 through the end of March 2002. Shortly after I was hired as an agent in the Bowling Green, Kentucky office, I was promoted to Unit Manager, and 15 days after that, I was officially promoted to the position of Branch Manager for the Russell Springs Office of the Bowling Green Branch. In December 2000, I was promoted to manage the Lexington Branch, at which I had more than 70 insurance agents working under me in eastern and central Kentucky.

    (2)    Bankers tracked Branch performance in eight categories, and in January, 2002, my Branch was number one in the country in four of those categories out of more than 200 offices. After becoming manager in the Lexington office, I did all of the training of the agents using the materials, instructions, and protocols from Bankers.

    (3)    Near the end of February, 2002, while climbing some stairs at the office, I stepped on a loose tile and fell down the stairs, breaking my pelvic bone and herniating three discs in my back. Since I was disabled, I went on a leave of

absence and filed a worker's compensation claim. Several weeks later I received a letter stating that my Branch Manager contract had been terminated, but that the Company would keep me on as an agent. I never agreed to stay on as an agent, and any relationship with Bankers was terminated.

(4) I have been asked to set forth facts that I am aware of with regard to long-term care policy sales and practices at Bankers during the time I worked there, and therefore the information stated below addresses only long-term care or related matters at Bankers.

(5) Bankers had no formal training for agents. As an agent, I was trained by a Bankers Agency Manager, and after I became an agency manager for Bankers, I trained new agents on how to sell long-term care insurance and other products offered by Bankers. One day of training was the most there was on long-term care insurance for the new agents.

(6) We were trained and told in the Bankers' training materials how to sell the policies, what different policies were available, what they supposedly covered. I did not get trained off of the policy forms and did not train agents off of the policy forms. The Bankers' training materials consisted of a couple of videos. There were no training manuals. The only manuals Bankers made available when I was branch manager were agency management manuals that covered office procedures. There were no manuals on long-term care insurance.

(7)     In the agent training, the sales brochure for each long-term care policy was relied on heavily. The training was on how to sell the product.

(8)     We were trained to sell off the brochure. The key to the marketing approach used at Bankers was use of beautiful color brochures that tell the applicant all about Bankers Life & Casualty Company, one of the most respected insurance companies and your partner in life and health that is there to protect you, your spouse and family. It then talks about providing coverage for expenses of nursing home care, home health care and other long-term categories of care. That is what you sell off of because it looks appealing and the words in the brochure seem to be understandable and clear.

(9)     The agents would not sell off of the application or the policy. We would never sell off of the policy, and in fact never had a policy to sell off of. You couldn't sell using one of those long-term care policies because of how complicated they are. The policies are written by lawyers and when selling a policy, you never show the policy because you would rarely get a sale if you used the policy.

(10)    The brochure was always supposed to be used in the sales presentation and in all of the training the brochure was relied on heavily. It was essentially the brochure, or part of the brochure that was being presented or emphasized in a sales presentation.

(11)    The training demonstrated that when you go through the sales presentation and

use the brochure, you highlight or circle, in a red pen or yellow highlighter, all of those points that you're selling off of. Agents were trained to do what is called a needs assessment so that you could find out things that are important to the customer. When you find those things that they are interested in, those are the things that you circle and make a big point about in the sales presentation.

(12)   The agents were taught to recognize the role of the family in the decision to purchase long-term care insurance and that in the sales presentations they should point out that it is to protect not only you but your spouse and family. In particular, it would provide financial security and emotional comfort to your spouse and family.

(13)   Agents were taught that in the sales presentation they should emphasize the patient care coordinator program for claims and that a care coordinator would be assigned to assist in making a claim. They were also told to make reference to and emphasize tax-qualified long-term care insurance because that was a big selling point. Being able to use premiums as an income tax deduction was very appealing to the elderly. There was also a tax-qualified form that would be given to an applicant if you were selling a tax-qualified long-term care policy. That was also an invaluable tool in making the sale.

(14)   We also had agent meetings to discuss what was going on out in the field and what worked or didn't work in selling long-term care insurance. Everyone

would soon understand that as an agent, you explain only what you need in order to sell the policy. Once the people you are selling to say, "boy, this is what I want," you say nothing else and start filling out the application. In other words, in the sales presentation you talk only to the point where they are ready to buy. The theory behind that is that you are there to sell it – you're not there to explain it, so once you make the sale you get the check and get out. If you say too much, you might kill the sale.

(15)    I found that the agents had trouble understanding the long-term care policies, even after they have had the training in the sales office on how to sell and what the policy is supposed to cover. Even after extensive experience, they didn't understand the policies they were selling.

(16)    The brochure will say that it is for information only and not a contract. But you never see the contract when you buy it, and nobody seems to read their policies after they receive them. If they did, the policies are so confusing and difficult to understand that the policyholder, especially elderly policyholders, will just trust what they were told by the agent. The elderly accepted what they were told by the agent or things that were pointed out to them in the brochures. That was common knowledge.

(17)    The agents, even those that were highly educated, did not understand long-term care insurance. What they were primarily taught is how to sell. They were not

taught the other side of it. Bankers tells you the good things about the insurance
and how to sell it. They don't tell you how to resolve any problems with it.
Problems arise, and that's when Home Office Claims is supposed to take care of
that. As an agent, you are never ever taught the ins-and-outs of a policy. The
approach was that, as an agent you have no reason to know the policy in depth.
All you need to know is what's in the brochure and how to sell – that's all the
sales rep does, sell the policy.

(18)   In the training sessions, the sales reps were taught to sell and the points to make
about the insurance to accomplish that. Bankers did not seem to care if you
understand the product or how it is supposed to work. They just wanted the
agents to sell the insurance, and the training was built on sales only.

(19)   Not only was long-term care insurance difficult for the agents to understand, but
the elderly particularly have trouble understanding those policies. It seemed the
older people were, the more difficulty they would have understanding it. It
seemed to me that the elderly were the most trusting people on earth, and they
will just accept what the agent tells them.

(20)   I also found that what happens with most people, and especially the elderly is
that when they have a problem with their insurance company, they just give up.
They don't want to go through the frustration and don't have the strength,
energy, time, or the will power to fight.

(21)    Most of the time the agents didn't last very long. The agent turnover rate at Bankers was very high and the company did not seem to care. It seemed like it almost preferred that because if agents leave the company, then the company keeps the renewal commissions. New agents were also a source of sales because a new agent would immediately sell long-term care insurance or other Bankers' products to relatives and friends for the first two or three months, and then when those sources of sales were exhausted, they would either quit or be terminated a few months later when they were unable to produce.

(22)    Bankers' executives promoted the high agent turnover rate and just wanted more and more agents trying to sell. Bankers was forever having meetings for all the agency managers and they would require us to come to Chicago or other places. The meetings were essentially pep rallies and presided over by Scott Perry, who is now President and CEO of Bankers Life & Casualty Company. I remember being shocked at one of the first meetings I went to in Florida where Mr. Perry said, "hire the masses, put them in classes, and kick them in the asses." That seemed to be one of his favorite little sayings or motto, because I heard him say that on other occasions at other meetings where the top executives from Bankers would sometimes be at those meetings. I remember meeting Ed Berube, the then president and CEO of Bankers at one of the meetings. At one of the meetings, I got into a heated discussion with Scott Perry because he told the managers not to

1000Ragle_Aff         7

interview anybody over 40, and they had sent out a memo to that effect. I was in my late 50's at that time and objected to that kind of discrimination.

(23) On calls or questions that we would get in the sales office, 99 out of 100 would be referred to claims in Chicago. We would never try to explain a policy or coverage. If you wanted to get yourself in deep trouble, trying to explain coverage or a policy to somebody would be a quick way to do that. We just wouldn't do that. They would be referred to Chicago.

(24) On the rare occasions when we would call the Home Office, unless we asked for claims, we would get customer service. It appeared to me that customer service was designed to confuse and confound. There were rumors that calls going to the home office were actually going someplace else and some of the people in my office were noticing strange accents when they called the company. I don't remember exactly why I started digging into the calls going offshore, but one of my agents told me that when they called Bankers in Chicago they thought they were talking to some foreigner some place. We were told by Bankers at different times that that was not the case and that all calls went to Chicago, but then I soon learned that that wasn't the truth. We then heard something about a call center in India. That was eventually confirmed in a memo, and I heard that some of the people at the call centers were given English names. I got concerned because if you have some senior citizen here in the states trying to talk to somebody in

India about your policy or your claim, it just didn't seem like a good practice, even though the company may have been saving money.

(25)     Although our agency office rarely got involved in any claim matters, shortly before my employment at Bankers ended, an incident occurred when one of my agents, Barbara Stratton, came to me and explained that she had written a long-term care policy for a friend of hers who had called the Home Office and was very upset because what we had been told about the insurance was different than what the policyholder was told when they called the Home Office. When I called the policyholder, I found out that either the husband or wife had filed a claim and that when they called the Bankers' 800 number they were getting the run-around and were having trouble getting anything done. When we sold the long-term care policies, we were told to emphasize that if you ever had a claim, there would be a care coordinator assigned to your claim, and when the policyholder called and asked for the care coordinator there wasn't one. I immediately called Chicago to talk to a claims manager and was literally laughed off the phone. The lady said, "we don't have care coordinators." I asked the lady if she knew who she was talking to, and she said, "I don't care who I'm talking to." I then explained that I was a branch manager and that we sell these policies and she said, "so?" She couldn't have cared less.

(26) At Bankers, I discovered you never know what your coverage is until you have a claim and then somebody tells you. When I realized that, I told my agents in a sales meeting to not sell anything unless you are certain of exactly what it would do.

(27) I eventually came to realize that we could never get a straight answer when we called Chicago. It was always somebody else, some other department that handled that. I let people at Bankers know that things were not being handled the way they should and that may have been what got me fired as manager.

(28) I am familiar with Policy Form GR-N325, which was one of our long-term care products. We sold that policy as long-term care insurance, but it was more limited than some of the other long-term care policies, and was therefore cheaper and easier to sell. For that reason the agents liked to sell that policy, and it seemed popular with the elderly.

(29) Agents frequently pre-assess the type of policy that will be offered to a prospect by their neighborhood, size of home, furnishings, etc., and then try to sell a policy form that will be affordable. An agent never wants to discourage a prospect by trying to sell them a policy they cannot afford which might create a negative reaction. In other words, if you go in to a neighborhood that appears to be low to middle class with small homes, you wouldn't go in and try to sell one of the more expensive policies. You would approach them with one of the

cheaper long-term care policies. These were the types of things discussed in the agent meetings.

(30)    The type of policy presented by an agent to a prospect is sometimes also affected by the agent's circumstances. For example, agents might go for a quicker and easier sale if they hadn't made many sales lately or for some other reason needed some income sooner, rather than later. If they had bills pending or overdue, they might opt for a quicker and easier sale. The GR-N325 policy was cheaper and therefore easier to sell to the prospect, and it was quicker and easier to process through Bankers. It was easier to get underwritten because the underwriting questions are not near as tough as on the more expensive policies. Nor would the N325 normally require any follow-up inquiries or examinations that could delay issuing the policy. An agent's financial condition/pressures sometimes dictated the long-term care policy form that they tried to sell.

(31)    Sometimes an agent's schedule also dictates trying to sell a cheaper long-term care policy, such as the N325. For example, an agent might have overscheduled and has another appointment in a few hours or may need to pick up a child from school or get home to cook dinner by a certain time, and therefore they need to do a quick sale. The N325 would always be a quicker and easier sale than one of the more expensive long-term care policies.

(32)    It was common knowledge that the vast majority of agents never took the time to

go through the application with the applicant. If an agent went through everything on the application and tried to thoroughly explain everything in the brochure, it would take at least half a day and most agents never spent that much time on a sale. For example, just going through the fine print in the acknowledgements in the application to try to get the applicant to understand them would take a considerable time. The practice for most agents would be to read the questions that are on the application, and the agent would then check the boxes on the application and hand it to the applicant and ask them to sign it. People, particularly the elderly, will do what the agent asks them to do with regard to papers that need to be signed to get the insurance. They rarely, if ever, would read everything unless the agent specifically insisted that they do so or the agent actually read the documents to the applicant. The time that most agents spent with the applicant in the sale of long-term care policies clearly indicated that applicants do not read the acknowledgements or other lengthy boilerplate provisions in the documents they are asked to sign.

(33)   It was common knowledge at Bankers that people, especially the elderly, do not read the applications or their policies. The agents tell them what is covered, so why would they need to read anything, particularly if it's something with fine print or a policy that is a dozen pages long that they can't understand?

(34)   If an agent makes a sale, he or she is supposed to deliver the policy and get a

delivery receipt signed. That's what was supposed to happen, but sometimes they simply mailed them out. If there is a delivery receipt, it would be in the agency office file and would also go to the home office. At Bankers, we could use the computer to see if and when a policy was delivered. It was called a Conseco Information System, and you could pull up information to find out when the agent received the policy for delivery and when it was delivered, if it was delivered, and who signed it. If it was mailed and a delivery receipt enclosed in the mail and was returned to the agent, that would show on the screen. Sometimes an agent might not want to deliver the policy because it gives the insured an opportunity to ask questions about it if they happen to look at the policy, and it also gives the insured an opportunity to reject or cancel the policy when they see it. Those types of things were discussed in sales meetings.

Robert W. Ragle

Subscribed and sworn to before me this 13 day of May, 2008.

By _Angelia Miller_
Notary Public

My commission expires: 12-18-09

# APPENDIX F

CV07-01281
*Rowe v. Bankers Life*

Appendices D-F to Plaintiffs' Separate and
Controverting Statement of Facts in Support of
Plaintiffs' Response to Defendant's Motion for
Summary Judgment

# AFFIDAVIT OF LOLA JUDY

STATE OF ARIZONA          )
                                        ss.
County of Maricopa        )

My name is Lola Judy, and this Affidavit is made on personal knowledge, and I am competent to testify to the matters set forth below.

(1)     I am the owner of Sun Cities Caregivers in Sun City, Arizona. We provide care to the elderly.

(2)     We provided non-medical home care for Carol J. Anderson from June 23 to September 25, 2004. That home care involved assistance with activities of daily living. My file on Carol Anderson shows she was insured by Bankers Life under a policy that provided benefits for home care and Bankers Life claimed that Sun Cities Caregivers were not licensed or certified by the appropriate agency. I don't understand that because such licensing is not required or even available in Arizona for non-medical home care, and because Bankers Life had paid on another client's similar care.

(3)     We had a similar problem with Bankers Life in the past. Bankers Life had denied our client's benefits for non-medical home care on the grounds that Sun Cities Caregivers was not a licensed provider. I fought that denial by arguing that we had a current non-medical home care client at that time that Bankers Life was paying for. The client they were denying had exactly the same criteria in his Bankers Life contract as the client whose care they had been paying for. I asked

1000Judy_Aff                                  1

1    them why they were denying the claim and it took an awfully long time to finally

2    get it approved. I made numerous phone calls to Bankers Life over a period of

3

4    two or three months. The claim was finally approved by Bankers Life after I

5    wrote a letter stating that I could not understand why they were denying such

6    benefits when they had been previously approved for another client, and I showed

7    a copy of that letter going to the Arizona Attorney General and to the Arizona

8

9    Department of Insurance. It wasn't long after that that Bankers Life agreed to

10   pay.

11  (4)   Attached is a true copy of my file on Carol J. Anderson which I have retrieved

12     from storage.

13

14

15                *Lola Judy*
                      Lola Judy

16             Subscribed and sworn to before me this 9

17             day of May 2008.

18

19               By

                      Notary Public

20             My commission expires: 1-31-2012

21

22

23

24

25

26

27

28

OFFICIAL SEAL
NANCY J. DRIVER
NOTARY PUBLIC – ARIZONA
MARICOPA COUNTY
My Comm. Expires Jan. 31, 2012



**BANKERS LIFE AND CASUALTY COMPANY**
222 Merchandise Mart Plaza • Chicago, IL 60654-2001
Telephone: 312-396-6000

August 19, 2004

ANDERSON CAROL J
█████████████
SUN CITY AZ   85351

5000      784439-1 BLC

PATIENT NAME:   ANDERSON CAROL J
REGARDING:      201,020,658

EXPENSE(S) SUBMITTED:
SUN CITIES CAREGIVER      6-23 TO 7-22          6,880.50

Dear Ms Anderson:

Your CONVALESCENT CARE insurance pays benefits for home health care when
the services and supplies are provided by a Home Health Care Agency
which is licensed or certified by the appropriate agency.

Based on the information we received, Sun Cities Caregivers is not
licensed or certified as a Home Health Care Agency.  So, no benefits can
be paid.

I'm sorry we cannot help at this time.  We hate to disappoint anyone,
but we must treat all of our policyholders with equal fairness.  This
means we are obligated to pay or decline benefits based strictly on the
claim facts and the policy terms.

You have the right to appeal this decision.  If you feel there are other
facts that we should consider, please write or call:  Bankers Life &
Casualty, Claim Review Department, at the above address.  312-396-6000,
Extension 4300.


Policy Benefits Department


SCCG-000003

BL0520FB (4/91)

*BANKERS LIFE AND CASUALTY COMPANY*
*Policy Benefits Dept. - PO Box 66927*
*Chicago, IL 60666-0927 - Telephone: 312-396-6000*

# HOME HEALTH CARE / RESPITE / HOSPICE / ADULT DAY CARE CLAIM FORM

The patient or responsible person must complete Page 1 in full and sign.
Then the physician must complete and sign Page 2 and the provider of services must complete and sign Page 3.
The patient or provider should attach a complete copy of the itemized billing statement.
See Page 4 for instructions on how to file your claim.

## PATIENT'S CLAIM FORM

| 1. LIST ALL POLICY/CERTIFICATE NUMBERS | 2. SOCIAL SECURITY NUMBER |
|---|---|
| 2010‑2‑0658 | DATE OF BIRTH ▐ |

**3. PATIENT'S NAME & ADDRESS - IF ADDRESS IS NEW, PLEASE CHECK BOX.** ☐  PHONE NO. (AREA CODE)

Carol J. Anderson ▐ SunCity, AZ 28535

| 4. DATE YOU BECAME ILL OR DATE OF ACCIDENT | 5. DATE YOU FIRST SAW ANY DOCTOR FOR THIS CONDITION |
|---|---|
| MONTH 6 DAY 13 YEAR 04 | MONTH 6 DAY 25 YEAR 04 |

**6. FAMILY OR PRIMARY CARE DOCTOR'S NAME AND ADDRESS**

DR. SHARMA
13041 N. Del Webb Blvd - SunCity, Az 85351

AUTHORIZATION: I HEREBY AUTHORIZE ANY MEDICAL PROFESSIONAL, HOSPITAL, OR OTHER MEDICAL-CARE INSTITUTION, INSURANCE SUPPORT ORGANIZATION, GOVERNMENTAL AGENCY, INSURANCE COMPANY, EMPLOYER, OR OTHER ORGANIZATION, INSTITUTION OR PERSON THAT HAS ANY INFORMATION, RECORDS OR KNOWLEDGE OF ME OR MY HEALTH TO FURNISH TO BANKERS LIFE AND CASUALTY COMPANY OR ITS REPRESENTATIVES AND PERMIT THEM TO EXAMINE AND COPY ANY INFORMATION. I UNDERSTAND THAT SUCH INFORMATION WILL BE USED FOR THE PURPOSE OF EVALUATING MY CLAIM FOR INSURANCE BENEFITS AND THAT I ACKNOWLEDGE THAT I OR MY AUTHORIZED REPRESENTATIVE HAVE A RIGHT TO A COPY OF THIS AUTHORIZATION UPON REQUEST. A COPY OF THIS AUTHORIZATION, OR THE ORIGINAL SHALL BE VALID FROM THE DATE SIGNED FOR THE DURATION OF THE CLAIM OR THE TERM OF THE COVERAGE.

**YOUR STATE REQUIRES US TO NOTIFY YOU THAT: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING HE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.**

IMPORTANT - PATIENT PLEASE SIGN HERE

▐ DATE 6-24-04

(SIGNATURE OF PATIENT / RESPONSIBLE PARTY)

IF POWER OF ATTORNEY OR GUARDIAN, PLEASE ATTACH A COPY OF THE APPROPRIATE DOCUMENT.

POWER OF ATTORNEY'S ADDRESS _____

POWER OF ATTORNEY'S PHONE NUMBER _____

SCCG-000013

# HOME HEALTH / RESPITE / HOSPICE / ADULT DAY CARE PROVIDER'S CLAIM FORM

## PLEASE ANSWER ALL QUESTIONS AND SIGN BELOW

1. PATIENT'S NAME:
*Carol J Anderson*

2. AGENCY / FACILITY / PROVIDER NAME
*Sun Cities Caregivers*

3. TAX ID
██████████

4. ADDRESS
██████████ *Ste J5*

5. PHONE NUMBER
██████████

6. FAX NUMBER
██████████

7. TYPE OF LICENSE(S) HELD BY THE AGENCY / FACILITY / PROVIDER OF CARE:
*AZ does not license home care agencies*

DATE LICENSE(S) EXPIRE:     PLEASE ATTACH A COPY OF THE LICENSE *RN's license included*

8. ARE YOU MEDICARE CERTIFIED?     YES _____     NO ✓

IF YES, WAS THIS CLAIM FILED WITH MEDICARE?     YES _____     NO _____

IF YES, DATES MEDICARE COVERED:     FROM: _____     TO: _____

IF NO, PLEASE EXPLAIN:

*We only provide custodial care with RN supervision. and personal*

9. PLEASE ATTACH A COPY OF THE SIGNED DOCTOR'S PLAN OF TREATMENT / CERTIFICATATION, DAILY CARE NOTES, AND ITEMIZED BILL.

COMPLETED BY *Lola Judy*     POSITION *President*     DATE *6-24-04*

PHONE NUMBER *623 974 2397*     FAX NUMBER *623 974 2395*

SCCG-000014